**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

DAVIS NEUROLOGY, P.A.,
On behalf of itself and all other entities and
persons similarly situated,

                              Plaintiffs,

              v.                                    Case No. 4:16-cv-00371-BSM

DENTAL EQUITIES, LLC d/b/a
PEER UNITED, FIRST ARKANSAS BANK
& TRUST and JOHN DOES 1–10,

                              Defendants.

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND RESPONSE TO OBJECTIONS

Plaintiff Davis Neurology, P.A. ("Representative Plaintiff"), individually and on behalf of all others similarly situated, hereby submits this Memorandum in support of its Motion for Final Approval of Class Action and Response to Objections ("Motion for Final Approval"). For the reasons explained herein, the Representative Plaintiff respectfully requests that the Court: (1) grant final approval to the Settlement as fair, reasonable, and adequate, and in the best interest of all class members; (2) grant final certification of the Settlement Class under Rule 23(a), 23(b)(3), and 23(b)(2); (3) determine that notice was provided to the Settlement Class in conformity with the Court's Preliminary Approval Order, Rule 23(c)(2)(B), and due process; and (4) enter the Final Approval Order and Judgment attached as **Exhibit A** to the Motion for Final Approval.[1]

---

[1] The Plaintiff has already filed a separate petition for attorney's fees, costs, and incentive award. (*See* Dkt. Nos. 49-52.)

## INTRODUCTION

The Representative Plaintiff has procured a settlement with Defendants Dental Equities, LLC ("Dental Equities") and First Arkansas Bank & Trust ("First Arkansas") (collectively, the "Defendants") on favorable terms for a settlement class (the "Settlement Class") consisting of individuals who received one or more unsolicited blast faxes sent by the Defendants and therefore have a claim under the Telephone Consumer Protection Act ("TCPA"). The Settlement includes a non-reversionary $1,525,000.00 common fund for the benefit of the Settlement Class, along with injunctive relief to prevent future violations. The Court-approved notice and claims administration process is nearly complete. Based on the number of claims submitted to date, each class claimant will be receiving a ***net recovery*** of approximately ***$172 per fax***. That amount is considerably more – indeed, multiple times more – than courts have approved on a per-claim basis in comparable TCPA cases.

Under the relevant factors in the Eighth Circuit, the proposed Settlement merits final approval. First, the Settlement enjoys a strong presumption of validity because it followed on the heels of substantial document discovery and was negotiated at arm's-length through a highly qualified, third-party neutral mediator, Richard Ramsay, a President *Emeritus* of the Arkansas Bar Association. Second, the Settlement confers substantial benefits on Class Members, including both monetary and injunctive relief, without the uncertainty and risk inherent in litigating this matter through trial. Based on the claims made to date, the recovery per Class claimant far exceeds what courts in TCPA class action settlements have found to be "fair, reasonable, and adequate." At the same time, if the case were to proceed without a settlement, there are always substantial risks – reflected in cases from both inside and outside of the Eighth Circuit – that the claims could be dismissed on the merits, that a class might not be certified for

reasons such as a lack of ascertainability of the class or the predominance of individualized issues of consent, or that the Class could proceed to trial and simply lose.  Third, continuing litigation involves substantial additional time and expense, likely including dispositive motion practice, expert fees, a contested class certification motion, and an appeal under Rule 23(f) should a class be certified.  The prospect of a substantial, immediate recovery without further litigation strongly favors approval.  Fourth, First Arkansas is in a financial position to meet its obligations under the Settlement and otherwise would appear to have the resources to mount a vigorous defense of the case.  Fifth, as discussed below, the collective "Objection" is without merit.  Accordingly, all of the relevant factors favor approval.

As to the single omnibus "Objection to Final Approval of Class Settlement" filed by counsel on behalf of 48 purported objectors (Dkt. No. 42 (the "Objection")), it is not well taken on the merits and lacks fundamental indicia of credibility. The Objection wrongly comprehends both the process employed in reaching the Settlement as well as its most essential elements.  As the parties previously stipulated and the Court expressly recognized, MasterCard will not be released by this Settlement and the *Scoma* Plaintiffs are free to pursue any existing claims they may believe they have against MasterCard.  Moreover, contrary to what the Objection asserts, prior to and as a precondition to engaging in the mediated settlement discussions that led to this Settlement, the Representative Plaintiff obtained and reviewed over 5 GB of documents produced by Dr. Kianor Shah and Dental Equities, LLC relating directly to the creation and sending of the fax advertisement at issue. To this end, the instant brief provides substantial discussion of the merits of the case weighed against the potential risks of further litigation.  Even on a per class claimant basis, the substantial monetary recovery for claimants exceeds recoveries on a per claim basis found to be reasonable in comparable TCPA class action settlements.

Finally, as confirmed by the Affidavit of Richard L. Ramsay (a President *Emeritus* of the Arkansas Bar Association and distinguished mediator) and the Affidavit of Arkansas legal practitioner Sidney McCollum (a senior member of the Arkansas bar whose track record as a private attorney, Assistant United States Attorney, judge, and preeminent mediator is beyond reproach)[2], the Settlement is the product of zealous efforts of Settlement Class Counsel to procure substantial monetary and injunctive relief for Settlement Class Members, not a "reverse auction" to the detriment of the Settlement Class.

Accordingly, for the reasons set forth herein, the Representative Plaintiff respectfully requests that the Court grant final approval to the Settlement.

## BACKGROUND[3]

Representative Plaintiff, by and through counsel, initially filed this action on January 15, 2016 in Arkansas state court against Dental Equities and its founding member, Dr. Kianor Shahmohammadi aka Dr. Kianor Shah, for violations of the TCPA, on behalf of itself and a class of similarly situated individuals and entities who received the unsolicited fax advertisements.[4] After a period of investigation and discovery of detailed financial information for both Dr. Shah

---

[2] Affidavit of Richard L. Ramsay, attached as **Exhibit 2** to the accompanying Declaration of Joe P. Leniski in Support of Motion for Final Approval of Class Action Settlement and Response to Objections (the "Fourth Leniski Declaration"); Affidavit of Sidney McCollum, attached as **Exhibit 1** to the Fourth Leniski Declaration.  The Ramsay Affidavit was originally filed at Dkt. No. 34-4, while the McCollum Affidavit was originally filed at Dkt. No. 50-5.  For clarity of the record, they are being re-filed here in support of the Motion for Final Approval.

[3] The Representative Plaintiff previously detailed the facts and procedural history of this case in its Memorandum in Support of Motion for Preliminary Approval of Class Settlement, for Certification of a Settlement Class, and for Permission to Disseminate Class Notice. (Dkt. No. 25 at pp. 2-12.)  The Representative Plaintiff incorporates that section by reference and will reiterate only the most pertinent aspects of it herein.  The facts stated herein are drawn from the record and from the Declaration of Joe P. Leniski, Jr. filed in support of the previously filed Motion for Attorney's Fees, Costs, and Incentive Award (Dkt. No. 52) ("Third Leniski Declaration").

[4] The lawsuit also named several "John Doe" defendants whom the Representative Plaintiff believed were also involved in sending the fax in question, but whose identity was unknown at the time.  The Representative Plaintiff served Dental Equities on January 21, 2016.

4

and Dental Equities and the circumstances involved in the sending of the faxes at issue, as well as the review of multiple gigabytes of data including documents and communications exchanged between the entities involved in creating and sending the fax advertisements, Representative Plaintiff amended its complaint on May 12, 2016 to add First Arkansas as a defendant.[5]   On June 14, 2016, Defendant First Arkansas removed this case to the U.S. District Court for the Eastern District of Arkansas.[6]

Beginning in June 2016, counsel for First Arkansas and Settlement Class Counsel on behalf of the Representative Plaintiff engaged in preliminary discussions regarding the possibility of settlement, which culminated in an agreement to mediate the lawsuit before a qualified, independent third-party mediator.  In August 2016, the parties ultimately held an all-day mediation before Richard L. Ramsay, a President *Emeritus* of the Arkansas Bar Association and Southern Conference of Bar Presidents,[7] which resulted in the parties reaching a settlement in principle.  The resulting arms-length negotiation resulted in a proposed settlement ultimately memorialized in the Settlement Agreement, pursuant to which First Arkansas agreed to pay $1,525,000.00 into a non-reversionary settlement fund (which would cover not only the valid claims of class members, but also costs of claims administration, as well as any award of attorney's fees, expenses, and an incentive award) and class-wide injunctive relief against sending any fax (either directly or by authorizing another entity to do so) advertising the

---

[5] On May 13, 2016, the Representative Plaintiff filed a Second Amended Complaint which added details related to the faxes and First Arkansas, included an additional exhibit related to the number of faxes at issue, and provided a more tailored class definition.  (*See* Dkt. No. 4.)  The First and Second Amended Class Action Complaints were served on First Arkansas on May 18, 2016.

[6] Dkt. No. 1.

[7] *See* Dkt. No. 34-3, Affidavit of Richard Ramsay.

availability of "Doctors Club" credit cards without the recipients' prior express consent and without including the opt-out notice required by law.

The parties further negotiated the terms and process for obtaining Court approval of both the Settlement and a petition for an award of attorneys' fees and reimbursement of expenses by Settlement Class Counsel, as well as the petition for an incentive award to the Representative Plaintiff.[8]

On October 11, 2016, the Representative Plaintiff filed its papers in support of Preliminary Approval of the Class Settlement.  A group of objecting class members filed a notice of objection to preliminary approval on October 20, 2016.[9]   Representative Plaintiff filed a Response addressing the objections on October 28, 2016 (Dkt. No. 33).

On November 7, 2016, the Court held oral argument on the pending motions.  At the hearing, the Court heard argument from counsel for both the Representative Plaintiff and First Arkansas, as well as from counsel representing the objectors as to the specific nature of their objections to the proposed Settlement Agreement.  On November 18, 2016, the Court issued an Order Conditionally Certifying a Settlement Class, Preliminarily Approving Class Action Settlement, Approving Notice Plan, and Setting Final Approval Hearing.  (Dkt. No. 40.)[10]   The Court preliminarily approved the Settlement Agreement as fair, reasonable, adequate, and within the range of possible approval, found that the Settlement Agreement was negotiated in good faith at arm's length between experienced attorneys familiar with the legal and factual issues of the

---

[8] Significantly, consummation of the Settlement is not contingent on approval of the instant petition for attorney's fees and costs or the petition for the incentive award.

[9] On September 27, 2016, these same objectors (Scoma Chiropractic, P.A., Dr. William Gress, and Florence Mussat, S.C. ("Scoma, Gress, and Mussat")) filed a Motion to Intervene (Dkt. No. 18) and a Motion to Dismiss or Stay the Case (Dkt. No. 20).

[10] On November 10, 2016, the Court issued an Order denying the Motion to Intervene on the merits and denying the Motion to Dismiss or Stay the Case as moot.  (Dkt. No. 39.)

case aided by an experienced and neutral third-party mediator, preliminarily certified the proposed Settlement Class, preliminarily approved Joe P. Leniski, Jr. of Branstetter, Stranch & Jennings PLLC ("Branstetter") and James A. Streett of the Streett Law Firm, P.A. ("Streett Law Firm") as Settlement Class Counsel, appointed Garden City Group ('GCG") to serve as the Claims Administrator, approved the proposed Class Notice plan, set deadlines for objections and opt-out notices, and set a final approval hearing for April 3, 2017.

## II. Claims Process and Opt-Out Notifications

The Notice Plan approved by the Court included both notice by fax ("Fax Notice") and notice through a settlement website ("Settlement Website").[11]  As reflected in the Declaration of Jacqueline Brasefield in Support of Motion for Final Approval of Class Action Settlement ("Brasefield Declaration"), GCG is a highly qualified settlement administrator with decades of experience in class action notice and claims administration procedures.[12]  The Brasefield Declaration details GCG's compliance with the Court-approved Notice Plan in all respects and its dutiful execution of its role as the Claims Administrator for the Settlement Class.

Through the Court-approved Notice Plan, the Claims Administrator sent the Fax Notice to the same 381,013 unique numbers used for the transmission of the faxes, resulting in 341,129 successful fax transmissions.[13]  Thus, approximately 90% of the potential Settlement Class Members received direct notice of the Settlement at the same fax telephone number to which Defendants sent their original fax transmission.  The Claims Administrator made multiple

---

[11] *See* Dkt. No. 26, Declaration of Joe P. Leniski in Support of Motion for Preliminary Approval of Class Settlement, For Certification of a Settlement Class, and for Permission to Disseminate Class Notice ("First Leniski Declaration"), Exhibit 2 thereto.
[12] *See* Dkt. No. 56, Notice of Filing (attaching Brasefield Declaration).
[13] Brasefield Decl. ¶ 7.

38075772.5

additional attempts to transmit faxes to the remaining 39,884 numbers.[14]   The Claims Administrator also resent fax notices to 22 individual Settlement Class Members in response to specific requests.[15]

The Claims Administrator also created and maintained a Settlement Website, www.doctorsclubfaxsettlement.com, to provide information and deadlines to Settlement Class Members, facilitate claims submissions, and answer frequently asked questions.[16]   The Settlement Website also published the Notice, Settlement Agreement, and Motion for Preliminary Approval.[17]   Finally, the Settlement Website allowed Settlement Class Members to submit claims electronically or to download a personalized claim form.[18]   As of March 20, 2017, there had been 3,272 visits to the Settlement Website.[19]

On March 4, 2016, to accommodate inquiries regarding the settlement, the Claims Administrator made operational a toll-free helpline that made information available to settlement class members at all times and that allowed callers to speak to a customer representative during normal business hours to address specific questions.[20]   The Claims Administrator has already received 832 calls to the toll-free helpline and will continue to maintain the helpline throughout administration of the Settlement.[21]

As of March 20, 2017, the Claims Administrator has received (1) 5,156 claims – approximately a 1.51% claims rate (relative to the 341,129 successful faxes); and (2) 14 opt-out

---

[14] *Id.*   Only one additional fax transmission was successful to that batch of numbers.
[15] *Id.*
[16] *Id.* ¶ 9.
[17] *Id.* at ¶ 9.
[18] *Id.* ¶ 9.
[19] *Id.* ¶ 11.
[20] *Id.* ¶ 10.
[21] *Id.* ¶ 10.

38075772.5

notices (0.004% of the Settlement Class).[22]   Also, although the deadline to submit claims was March 20, 2017, the Claims Administrator anticipates receiving additional claims postmarked by March 20, 2017 but received after the end of the Claims Period.[23]

No Settlement Class Members have directed any objections to the Settlement to the Claims Administrator.

Based on the current number of timely claims – assuming all claim amounts are successfully distributed and redeemed, and because no portion of the Settlement Fund will revert to the Defendants under the terms of the Settlement Agreement – the per-claimant gross recovery shall be approximately **$296**.  If the Court approves a 30% fee recovery, the requested fee award of $10,000 to the Representative Plaintiff, and the Claims Administrator completes its work within the parties' initial $170,000 allotment, the per-claimant take-home recovery will be approximately **$172**.[24] Inclusive of claims administration costs, which the Eighth Circuit recently confirmed should be treated as a benefit to the Settlement Class,[25] the per claimant recovery is **$205**.  As explained herein, by whatever metric the Court utilizes, that recovery is not only significant, but is multiple times higher than the per-claimant recovery achieved in other TCPA class action settlements that received final approval.

In exchange for the benefits conferred by the proposed Settlement, all Settlement Class Members who have not already opted out are deemed to have released the Released Claims, as

---

[22] *Id.*

[23] *Id.* ¶ 8.

[24] This is calculated as: $1,525,000 Settlement Fund, less $170,000 in administration costs, less a $10,000 incentive award, less approximately $457,500 in fees, divided by 5,156.  This figure would change based on the fee award, the final costs, and the amount of the incentive award.  It also assumes that claims administration costs will not exceed $170,000, which currently projects to be the case.

[25] *See Thut v. Lifetime Fitness, Inc. (In re Life Time Fitness Tel. Consumer Protection Act Litig.*), 847 F.3d 619, 623 (8th Cir. 2017)

9

that term is defined in the Settlement Agreement.  As made clear and stipulated by the parties and as reflected in the Court's Preliminary Approval Order, the definition of "Released Parties" *does not include* MasterCard International Incorporated ("MasterCard").[26]

### III. <u>Material Terms of the Settlement</u>

For the benefit of the Settlement Class, the Settlement (Dkt. No. 26-2) includes both monetary and injunctive relief.

The Settlement creates a "Settlement Fund" of $1,525,000.00, from which Settlement Class Members will receive *pro rata* cash payments (net of attorney's fees and costs, claims administration costs, and the Plaintiff's Incentive Award). (Settlement ¶ II.D.)  Claims required only the submission of a simple, one-page claim form to be submitted by mail, fax, or electronically through the Settlement website.  (*Id.* ¶ III.E.3.)  Settlement Class Members were afforded 90 days following the dissemination of Class Notice to submit their claims forms, giving them ample time to review the settlement terms and provide a claim.  (*Id.* ¶ II.3.)  The Settlement also provided that any amount above $50,000 remaining in the Settlement Fund after all valid claims are paid would be distributed *pro rata* (net of administration costs) among the Settlement Class Members who cashed their initial award.  (*Id.* ¶ III.F.1.)  In the event that the combined amounts of any settlement payment checks to Settlement Class Members that remain uncashed for more than 90 days is less than $50,000, the remaining money will be distributed *cy pres* to the Lawyers Committee for Civil Rights Under Law (¶ III.F.)  The Settlement Fund is non-reversionary: thus, no amounts of the Settlement Fund shall revert to the Defendants. (¶ III.C.)  As explained in the previous section, under the current number of timely claims and

---

[26] *See* Dkt. No. 40 at ¶ 2.

assuming a 100% claim redemption rate, the per-claimant gross recovery would be approximately $296 and the per-claimant net recovery would be approximately $172.

Notice and settlement administration costs, which the Eighth Circuit considers to be a benefit to the Settlement Class, come out of the Settlement Fund.[27]  The parties initially allocated $170,000 for that purpose, which projects to be sufficient when settlement distribution costs are included.

As a condition of the Settlement, the Defendants have also agreed to a permanent injunction against sending any fax (either directly or by authorizing someone else to do so) advertising the availability of "Doctors' Club" credit cards without the recipients' prior express consent and without including the opt-out notice required by law.  (*Id.* ¶ III.C.)

Furthermore, as a condition of the Settlement, the Defendants have agreed not to oppose certification of a Rule 23(b)(3) class and a 23(b)(2) class to effectuate class-wide monetary and injunctive relief.  (*Id.* ¶ III.A.)   The Defendants have made this concession even though First Arkansas maintains that, if the issue were contested, class certification would not be proper and litigation of the case as a class action would be unmanageable.  (*Id.*)  First Arkansas retains the right to contest Rule 23 certification if the Settlement is not finally approved for any reason. (¶¶ III.A-B.)

As explained in support of the previously filed Motion for Attorney's Fees, Costs, and Incentive Award (Dkt. 49), the Defendants also agreed not to oppose a fee request of up to 30% of the Settlement Fund (or $457,500), a request for reimbursement of Representative Plaintiff's reasonable costs, and a request for an Incentive Award of $10,000 to the Representative Plaintiff.

IV. **Objections to the Settlement**

---

[27] *See Thut.*, 847 F.3d at 623.

38075772.5

Counsel purporting to represent 48 objectors has filed an omnibus Objection to the proposed Settlement. The lack of merit of that Objection is discussed herein.

## FINAL APPROVAL STANDARD

Under Rule 23, "[a] district court may approve a class action settlement only after determining that it is fair, reasonable, and adequate."[28]   A settlement is fair, reasonable, and adequate and should be approved when "the interests of the class as a whole are better served by the settlement than by further litigation."[29]   The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context.[30]   In assessing the reasonableness of a settlement, the court should consider: the merits of the plaintiff's case, weighed against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement."[31]   Courts may also consider procedural fairness to ensure that the settlement is not the product of collusion, the experience of counsel on both sides, the settlement's timing, whether a settlement resulted from arm's-length negotiations, and whether a skilled mediator was involved.[32]

In sum, the court's role in reviewing a negotiated class settlement is "merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned."[33]

---

[28] *Ortega v. Uponor* (*In re Uponor, Inc.*), 716 F.3d 1057, 1063 (8th Cir. 2013) (quoting Fed. R. Civ. P. 23(e)(2)).
[29] Manual for Complex Litig., Fourth, § 21.61 at 480 (2010).
[30] *White v. NFL*, 822 F. Supp. 1389, 1416 (D. Minn. 1993).
[31] *Marshall v. NFL*, 787 F.3d 502, 509 (8th Cir. 2015); *In re Wireless Tele. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005).
[32] *Khoday v. Symantec Corp.*, 2016 U.S. Dist. LEXIS 55543, at * 19-20 (D. Minn. Apr. 4, 2016).
[33] *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d at 934.

**A. The Settlement is Presumptively Valid Because It is the Product of Arm's Length Negotiations Through a Third-Party Neutral Mediator.**

As the Eighth Circuit has observed, class action settlement agreements "are presumptively valid," a "strong public policy favors agreements, and courts should approach them with a presumption in their favor."[34]  In particular, "a settlement that is the product of arm's length negotiations is presumed to be fair and reasonable."[35]  Where the settlement was reached through arm's length negotiations through a third-party mediator, courts are particularly inclined to find that the settlement was fair.[36]

As the Representative Plaintiff has previously explained to the Court, the parties mediated their dispute before Richard L. Ramsay, a President-*Emeritus* of the Arkansas Bar Association and former President of the Southern Conference of Bar Presidents with substantial experience in alternative dispute resolution and commercial litigation.[37]  In advance of the mediation, the parties provided all filings to the mediator, submitted confidential mediation statements with supporting evidence, and participated in pre-mediation conference calls with the mediator to address their respective positions.  As Mr. Ramsay avers in his affidavit, on August 15, 2016, the parties participated in a full-day, hard-fought mediation with Mr. Ramsay, which

---

[34] *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir. 1999) (stating that, after the parties' arms-length negotiations, "judges should not substitute their own judgment as to optimal settlement terms for the judgments of the litigants and their counsel") (internal quotation marks omitted); *In re Uponor*, 716 F.3d at 1063.

[35] *Lee v. Anthem Ins. Cos.*, 2015 U.S. Dist. LEXIS 74902, at *4 (E.D. Mo. June 10, 2015) (quoting *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001)) (granting final approving to TCPA class action settlement).

[36] *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 943 (D. Minn. 2016) (citing *In re Zurn Pex Plumbing Prods. Liab. Litig.*, MDL No. 1958, 2013 U.S. Dist. LEXIS 27155, at *6 (D. Minn. Feb. 27, 2013)).

[37] *See* Dkt. No. 26, First Leniski Declaration, at ¶¶ 14-19; Dkt. No. 34-3, Ramsay Affidavit; Dkt. No. 52, Declaration of Joe P. Leniski, Jr. in Support of Motion for Attorney's Fees, Costs, and Incentive Award ("Third Leniski Declaration"), at ¶¶ 16-20.

38075772.5

resulted in the parties reaching a settlement in principle.  Throughout the mediation, Mr. Ramsay raised numerous legal and evidentiary issues related to each party's case, thereby forcing the parties to vet their respective analyses and to focus on the most critical elements of the case.  The resulting arm's-length negotiation resulted in a proposed settlement that was ultimately memorialized in the Settlement Agreement.

In light of these facts, the presumption of fairness strongly attaches here.  Furthermore, these same facts rebut the Objection's spurious and factually baseless claim that the Settlement was the result of some type of "reverse auction" by First Arkansas.  As numerous courts have found, "the participation of an independent mediator in the settlement negotiations virtually assures that the negotiations were conducted at arm's length and without collusion between the parties."[38]

## B.   The Substantial Benefits to the Settlement Class

The proposed settlement provides substantial relief for Settlement Class Members, particularly in light of the uncertainty, time, and cost of continued litigation.

In terms of the benefits to the Settlement Class, the Defendants have committed to pay $1,525,000 into the Settlement Fund.  As it stands, claimants will receive a net recovery of

---

[38] *Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007); *see also Milliron v. T-Mobile USA, Inc.*, 2009 U.S. Dist. LEXIS 101201, at *15 (D.N.J. Sept. 10, 2009) (stating same principle and holding that "the use of a mediator with respect to the present settlement is persuasive evidence that the negotiations were hard-fought, arms-length affairs"); *Michel v. WM Healthcare Solutions, Inc.*, 2014 U.S. Dist. LEXIS 15606, at *25-26 (S.D. Ohio Feb. 7, 2014) (approving TCPA class action settlement and finding "no identifiable risk of fraud or collusion" where "the parties engaged in arms-length negotiations and engaged the assistance of mediators to assemble a mutually agreeable settlement."); *Estrada v. iYogi, Inc.*, 2015 U.S. Dist. LEXIS 137299 (E.D. Cal. Oct. 6, 2015) (finding that TCPA settlement procured through third-party neutral mediator was non-collusive); *Manouchehri v. Styles for Less, Inc.*, 2016 U.S. Dist. LEXIS 80038, at *16 (S.D. Cal. June 20, 2016) (preliminarily approving TCPA settlement and finding that "[a] mediator's involvement during the course of settling a class action is evidence of arms-length, non-collusive negotiations.") (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)).

14

approximately $296 and a take-home recovery of approximately $172 each.  They also could receive redistributions of uncashed settlement checks.  If any money is left over, a worthy *cy pres* recipient will receive that balance.  The Settlement Fund is therefore non-reversionary, ensuring that all or nearly all monetary benefits will go to Settlement Class Members who make a timely and valid claim, and that ***no amount*** of the Settlement Fund will be returned to Defendants.  All of these aspects of the proposed settlement favor final approval.[39]

The fact that the Settlement Fund does not constitute the full measure of statutory damages available to the Settlement Class does not weigh against final approval.[40]  The Settlement was reached after factual investigation and discovery of the claims and issues, after taking into consideration the risks involved in the actions, after arm's-length negotiations presided over by an experienced mediator, and after thorough subsequent negotiations following the mediation.

As the Representative Plaintiff explained at the preliminary approval stage, even on a total per-class member basis, the proposed settlement is already in line with other TCPA class settlements in which the class received or stood to receive smaller *pro rata* monetary recoveries.[41]  This Court agreed and held the prospective recovery of $43 or more per claimant (assuming a 2% claim rate) was "within the range of reasonableness."  Now that claims have

---

[39] *See, e.g.*, *Hashw*, 182 F. Supp. 935, 942, 947-48 (D. Minn. 2016) (finally approving settlement).

[40] *See, e.g, In re BankAmerica Corp. Secs. Litig.*, 210 F.R.D. 694, 708 (E.D. Mo. 2002) ("[A] settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable, or inadequate."); *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1414 (D. Minn. 1987) ("A cash settlement amounting to only a fraction of the potential cash recovery (and the present proposed settlement is not such a recovery) does not in itself render the settlement unfair or inadequate.  In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (internal citations and quotations omitted).

[41] *See* Dkt. No. 27 at p. 17 n. 28

been received, the Court can appropriately evaluate the fairness of the Settlement by reference to the claimants, who will recover a gross amount of approximately **$296** and, depending the fee and incentive awards, will take home **at least** $**172 each**.  The Plaintiffs are therefore receiving a benefit that is approximately 60% of the statutory amount per fax, and taking home just under 40% of the potential statutory recovery.

As counsel for the Objectors argued to a federal district court in *In re Portfolio Recovery Associates*, the appropriate lens of inquiry for evaluating final fairness is the recovery *per claimant*, not per class member.[42]

The monetary recovery per claimant in this case far exceeds recoveries in other TCPA class action settlements that courts have finally approved, including multiple settlements within the Eighth Circuit.  For example, in *Hashw v. Department Stores Bank*, a district court within the Eighth Circuit recently found find that a settlement of *$33.20 per claimant* in a TCPA junk fax case was "both reasonable and fair."[43]   Other courts have finally approved TCPA class action settlements approximately for that amount or less:

| Case | Recovery Per Claimant |
|---|---|
| *In re Capital One Tel. Consumer Protection Act Litig.* [44] | $34.60 |
| *Couser v. Comenity Bank*[45] | $13.75 |
| *Rose v. Bank of Am. Corp.*[46] | $20 to $40 |
| *Adams v. AllianceOnce Receivables, Mgmt., Inc.*[47] | $40 |
| *In Re Portfolio Recovery Associates*[48] | $24 to $60 |

[42] *In Re Portfolio Recovery Assocs.*, No. 3:11-md-02295-JAH-BGS, Dkt. No. 355 (attached as part of collective **Exhibit 3** to Fourth Leniski Declaration).
[43] *See, e.g.*, *Hashw*, 182 F. Supp. 3d at 944-45.
[44] *Amadeck v. Capital One Fin. Corp. (In Re Capital One Tel. Consumer Protection Act Litig.)*, 80 F. Supp. 3d 781, 789-90 (N.D. Ill. 2015) (finding that settlement was reasonable under Rule 23(e) at a rate of $34.60 per claimant).
[45] *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1044-45 (S.D. Cal. 2015).
[46] *Rose v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 121641, at *5 (N.D. Cal. Aug. 29, 2014).
[47] *Adams v. AllianceOnce Receivables, Mgmt., Inc.*, Dkt. Nos. 116, 137 (S.D. Cal. 2008) (approving TCPA class settlement with per-claimant recovery of $40) (attached as **Exhibit 4** to Fourth Leniski Declaration).

38075772.5

Moreover, even if the Court were inclined to evaluate the settlement on a per class member basis (which is no longer necessary), the Settlement compares favorably with recent finally approved settlements.  Here, in the aggregate, the gross recovery per Settlement Class Member is approximately $4.00, while the net recovery is about $2.32 per member.[49]  These figures are comparable to or better than recoveries in other TCPA class action settlements:

| Case | Fund and Number of Class Members | Recovery Per Class Member[50] |
|---|---|---|
| *In re Capital One Tel. Consumer Prot. Act Litig*[51] | $75 million fund; 17.5 million members | $4.29 (gross) $2.72 (net) |
| *Wilkins v. HSBC Bank, Nev., N.A.*[52] | $39,975,000 fund; 9.1 million members | $4.41 (gross) $2.95 (net) |
| *Kramer v. Autobytel*[53] | $12.2 million fund; 47 million members | $0.26 (gross) |

---

[48] *In Re Portfolio Recovery Associates* Dkt. No. 335 at p. 19 and Dkt. No. 494, Final Approval Order (*see* collective **Exhibit 3** to Fourth Leniski Declaration).

[49] The gross recovery per Settlement Class Member reflects the value of the Settlement Fund ($1,525,000) divided by the number of unique numbers to which the fax at issue were successfully transmitted (381,013).  The net recovery per Settlement Class Member reflects the value of the Settlement Fund ($1,525,000), less the requested $10,000 Incentive Award, less a projected $170,000 in claims administration costs, less the requested fee award of $475,500, divided by 381,013.

[50] The Representative Plaintiff has calculated the gross recovery by dividing the total stated value of the settlement fund by the number of class members referenced in the associated district court ruling or underlying docket entries. Where the district court or the parties did not already identify the net recovery, the Representative Plaintiff has estimated the net recovery as the amount available to the settlement class members after deducting, fees, the incentive award, and the stated costs of administration (where specified), divided by the number of class members identified in district court orders or other docket entries.  The resulting figures are therefore approximations only for purposes of comparison.

[51] Master Docket No. 1:12-cv-10064, MDL No. 2416 (Dkt. No. 137) (N.D. Ill. July 29, 2014) (attached as **Exhibit 5** to Fourth Leniski Decl.), and *Amadeck*, 80 F. Supp. 3d at 789-90 (indicating that court had preliminarily approved settlement at a rate of $2.72 per class member and holding that, after receiving class claims forms, settlement was reasonable under Rule 23(e) at a rate of $34.60 per class member).

[52] 2015 U.S. Dist. LEXIS 23869, at *11 (N.D. Ill. Feb. 27, 2015)..

[53] No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012).

17

| *Malta v. Fed. Home Loan Mortg. Corp.*[54] | $17.1 million fund; 5.9 million members | $2.91 (gross) $1.67 (net) |
|---|---|---|
| *Adams v. AllianceOne Receivables Mgmt. Inc.*[55] | $9 million fund; 6.7 million members | $1.34 (gross) $0.52 (net) |
| *Palmer v. Sprint Nextel Corp.,*[56] | $5.5 million fund; 18.1 million members | $0.31 (gross) $0.16 (net) |
| *In Re Portfolio Recovery Assocs.*[57] [represented by Objectors' current counsel] | $18 million fund; 7.4 million members | $2.43 (gross) $1.75 (net)[58] |
| *Abrahamson v. Alpha Gas & Electric*[59] | $1.1 million settlement for 452,124 class members | $2.43 (gross)[60] |

In fact, two of the entities that signed onto the Objection in this case, Podiatry in Motion, Inc. and James Orrington, II D.D.S., P.C. were the named plaintiffs in *Podiatry in Motion, Inc., et al. v. CoverMyMeds, LLC, et al.*, No. 1:16-cv-2653, a TCPA class action in the U.S. District for the Northern District of Illinois in which they settled claims related to over **35 million fax transmissions** from a common fund of just **$9.6 million**, with a per share rate of recovery of just **$1.64 per share for prospective claimants**.[61]

---

[54] No. 3:10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving); and *Malta* Dkt. No. 91 (attached as **Exhibit 6** to Fourth Leniski Declaration) (granting final approval).

[55] No. 3:08-cv 00248, Dkt. Nos. 116 & 137 (S.D. Cal.) (**Exhibit 4** to Fourth Leniski Declaration).

[56] No. 2:09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash.) (attached as **Exhibit 7** to Fourth Leniski Declaration).

[57] **Exhibit 3** to Fourth Leniski Declaration.

[58] It is not clear from the docket entries what the administration costs were in this case. This figure is therefore likely higher than the actual net recovery per class member.

[59] No. 7:15-cv-05299-KMK, Dkt. Nos. 40 and 45 (S.D.N.Y.), attached as **Exhibit 8** to Fourth Leniski Declaration.

[60] The settlement in *Abrahamson* was preliminarily approved. The final approval hearing is pending.

[61] *See* **Exhibit 9** to Fourth Leniski Declaration, *Podiatry in Motion, Inc., et al. v. CoverMyMeds, LLC, et al.*, No. 1:16-cv-20653 (N.D. Ill.) (Dkt. Nos. 65 and 67). The Representative Plaintiff notes that the *CoverMyMeds* settlement included the transmission of 33.4 million "transactional faxes" and approximately 1.7 million "non-transactional faxes," the former counting for "one share," the latter for "five shares" towards recovery from the common fund. After a presumptive award of 33% for attorney's fees, $300,000 for administration costs, and $10,000 per named plaintiff for the incentive award, there would be $6,090,000 available for distribution to class

The Representative Plaintiff believes that its claims against Defendants have merit and that this case would be appropriate for class certification.  Nevertheless, the Representative Plaintiff and the Settlement Class could face a number of difficult substantive challenges if the litigation were to continue. Thus, prevailing on the merits of the claims and on a motion for class certification is by no means guaranteed.

As an initial matter, there is a divergence in federal opinion on whether certain plaintiffs in TCPA junk fax lawsuits lack Article III standing in light of *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).[62]  While Plaintiffs strongly disagree that *Spokeo* affects the standing of a TCPA plaintiff, First Arkansas nonetheless has a non-frivolous defense to the underlying TCPA claims at issue, and there is no guarantee that this Court or the Eighth Circuit would find that the cases that have recognized such a defense are distinguishable.

Also, although First Arkansas does not oppose class certification only for purposes of settlement, there is no guarantee that the Court would permit the underlying claims to proceed on the merits as a class action if First Arkansas were to contest class certification.  For example, a number of courts – including courts within the Eighth Circuit – have refused to certify junk fax classes or other types of TCPA classes because of ascertainability or manageability concerns,

---

members.  According to Memorandum in Support of Final Approval, the per-share recovery for claimants was just $1.64 (*Podiatry in Motion* Dkt. No. 65 at p. 6.)  At any rate, regardless of how the allocation of shares is weighted and distributed, the aggregate recovery per class member is substantially less than the aggregate per class member recovery here.  *See also William Gress v. Chiropractors Buying Grp., et al.*, 1:10-cv-03421, Dkt. Nos. 82, 84, and 90) (attached as collective **Exhibit 10** to Fourth Leniski Declaration) (approving $275,000 settlement with respect to an estimated 1 million fax transmissions, reflecting $0.28 recovery per fax).

[62] *See, e.g.*, *Evans & Green, LLP v. That's Great News, LLC*, 2012 U.S. Dist. LEXIS 147775, at *12-13 (W.D. Mo. Oct. 15, 2012); *ARcare v. Qiagen N. Am. Holdings, Inc.*, 2017 U.S. Dist. LEXIS 8344 (C.D. Cal. Jan. 19, 2017) (dismissing TCPA junk fax lawsuit for lack of standing); *Sartin v. EKF Diagnostics, Inc.*, 2016 U.S. Dist. LEXIS 86777 (E.D. La. July 5, 2016) (finding that allegations of junk faxes in violation of the TCPA were insufficient to support standing); *Romero v. Dep't Stores National Bank*, 2016 U.S. Dist. LEXIS 110889 (S.D. Cal. Aug. 5, 2016).

38075772.5

such as determining whether a particular number is a fax machine, whether it was transmitted over a "regular telephone line," and who owns (or owned) a particular fax machine and therefore has the right to recover.[63]   Certain courts within and outside of the Eighth Circuit have also held that individualized issues of consent may preclude class certification under Rule 23(b)(3) if those issues predominate over common issues.[64]   Some courts have even held that the issue of consent is "inherently individualized" in TCPA junk fax cases.[65]   Here, First Arkansas could assert (although Plaintiffs would vigorously contest) a defense that there will be predominating individualized issues as to whether CarePrecise – the company that furnished the fax numbers to Dental Equities – obtained express consent from at least some of the fax number subscribers.   If CarePrecise obtained consent relative to some numbers but not others, and did so in a variety of

---

[63] *See, e.g.*, *Saf-T-Gard Int'l, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D. Ill. 2008) (denying motion to certify class because there was no "realistic means of identifying potential class members"); *Levitt v. Fax.com*, 2007 U.S. Dist. LEXIS 83143, at *3 (D. Md. May 25, 2007) ("It is this need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable."); *APB Assocs. Bronco's Saloon, Inc.*, 297 F.R.D. 302 (E.D. Mich. 2013) (denying class certification on basis that class definitions were "imprecise and amorphous" because it was unclear whether number to which faxes were sent gave rise to claims by fax machine owner, the addressee, the person who saw the fax, or the person who paid the bill);   *see also Leyse v. Lifetime Entm't Servs., LLC*, 2017 U.S. App. LEXIS 2607 (2d Cir. Feb. 15, 2017) (affirming district court dismissal of putative TCPA class action on basis of ascertainability).

[64] *See, e.g. Hashw*, 182 F. Supp. 3d at 944 (listing cases); *O'Connor v. Diversified Consultants, Inc.*, 2013 U.S. Dist. LEXIS 74469, at *14-16 (E.D. Mo. May 28, 2013) (denying class certification of putative TCPA class action because issue of prior express consent would involve an "individualized inquiry"); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 238 (S.D. Ill. 2011) (finding that "determining which specific calls were made to individuals protected by the TCPA cannot be made by generalized proof at a class level"); *Balthazor v. Cent. Credit Servs.*, 2012 U.S. Dist. LEXIS 182275, at *16 (S.D. Fla. Dec. 27, 2012) ("[R]esolution of each putative class member's claim would necessarily involve an individual assessment of whether each class member consented to receive telephone calls on their cellular telephone numbers"); *Shamblin v. Obama*, 2015 U.S. Dist. LEXIS 54849, at *17-18 (M.D. Fla. Apr. 27, 2015) ("Defendants have a constitutional right to a jury determination as to whether a person consented to receiving calls to their cellular telephone").

[65] *APB Assocs.*, 297 F.R.D. at 320-21; *Fricko Inc. v. Novi BRS Enters., Inc.*, 2011 U.S. Dist. LEXIS 56124 (E.D Mich. May 25, 2011).

ways, the Court could find that individualized issues predominate.  Absent class certification, the likelihood of individual recovery by class members is effectively zero because the TCPA has no fee shifting provision and class members could recover at most only $1,500 per fax for a willful violation.  As the district court in *Hashw* explained, the possibility of denial of class certification in TCPA junk fax class action "is no illusory concern in the Eighth Circuit," and "without the ability to proceed as a class, it is unlikely most class members would have had any effective means of obtaining relief."[66]

Furthermore, even if a class were certified, there is no guarantee of a judgment in favor of the class.  First Arkansas maintains that Dental Equities acted without authority in sending the faxes at issue, and that First Arkansas therefore was not a "sender" of the faxes within the meaning of the TCPA.[67]  If a factfinder decides that Dental Equities indeed acted without authority, as First Arkansas claims, then an essential element of the class members' claims will be lacking and they will be entitled to no recovery from First Arkansas at all.

Finally, even if the Representative Plaintiff and the class were to prevail on the merits, First Arkansas could also assert (as many other defendants in TCPA cases have) that paying $500 per violation on claims involving negligible actual damages violates the due process clause.

---

[66] *Hashw*, 182 F. Supp. 3d at 944.

[67] *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016) (holding that agency principles apply in determining whether a fax was sent "on behalf of" a sender under the TCPA, and rejecting view that strict liability attaches to the entity whose services a fax promotes); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 798 (7th Cir. 2016) (holding that district court did not abuse its discretion in instructing jury that defendant was only a sender if it authorized the sending of the faxes at issue); *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 896-99 (6th Cir. 2016) (rejecting strict liability approach and setting out multi-factor test for whether faxes were sent "on behalf of" defendant, including degree of control over preparation of faxes, whether defendant approved content, and nature and terms of contractual relationship between defendant and entity that transmitted the fax).

Some courts have reduced aggregate statutory damages awards on this basis in TCPA cases and in other contexts.[68]

Taken collectively, these significant hurdles – both on the merits and as to class certification – weigh in favor of the proposed Settlement because the demonstrate the risks that the Settlement Class would face if the Settlement is not approved.

In light of these concerns, the Settlement is plainly reasonable, particularly with respect to those Claimants who stand to have a ***take-home recovery*** of approximately ***$172 per fax***.

### C. The Complexity and Expense of Further Litigation

"Class actions, in general place an enormous burden of costs and expenses upon parties."[69]   Accordingly, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."[70]  "The possible length and complexity of further litigation is a relevant consideration to the trial court in determining whether a class action settlement agreement should be affirmed."[71]

Notwithstanding discovery efforts to date, continued litigation would involve significant motion practice, including a contested motion for class certification and, perhaps, a motion for

---

[68] *See, e.g.*, *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 465 (D. Md. 2012) ("While the TCPA's provisions appear constitutional on their face, damages may become unconstitutional as applied in an individual case.  In such situations, a damages award may violate due process or constitute an 'excessive fine' under the Eighth Amendment."); *see also Aliano v. Joe Caputo & Sons - Algonquin, Inc.*, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.").

[69] *Marshall*, 787 F.3d at 512 (internal quotation and citation omitted).

[70] *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

[71] *In re Wireless Tel. Fed. Cost Recovery Fees. Litig.*, 2004 U.S. Dist. LEXIS 23342, at *39 (W.D. Mo. Apr. 20, 2014) (citing *Petrovic*, 200 F.3d at 1152).

summary judgment by First Arkansas.  Even if the Court certified a class, the Defendants would have the right to petition for interlocutory appeal under Fed. R. Civ. P. 23(f), necessitating further time and expense, and delaying proceedings even further if the appellate court accepts the appeal.  Regardless, if the case proceeds, the parties would need to conduct additional discovery, including written discovery and party depositions, as well as potential discovery of third parties. The parties would likely also need to engage experts to analyze the available transmittal data. Also, it would take a substantial amount of time, likely more than a year, before the case would go to trial, and any judgment in favor the class could be delayed by the appeal process.  These circumstances are akin to those in *Hashw*, in which a district court within the Eighth Circuit found that administrating a TCPA junk fax class action "would have been inherently complex and time-consuming," that "class certification would have proved a significant obstacle for [the named plaintiff] to surmount given the issue of consent," that the defendants would likely appeal under Rule 23(f) causing further time and expense, and that even "assuming that such a certification would have withstood scrutiny, proving liability and damages at trial would have been both costly and tedious."[72]

Ultimately, the Settlement Agreement provides claimants with real and immediate monetary and injunctive relief, in this purely statutory damages case where class members incurred nominal actual economic damages that are difficult to quantify.  Because the TCPA does not contain a fee shifting provision, class members would be limited to statutory damages of $500 per violation (or $1500 per willful violation), and there would be little incentive for an attorney to take (or an injured party to pursue) an individual claim for that small amount in federal court, including filing fees, discovery, and any necessary experts.  The Settlement Fund

---

[72] *Hashw*, 182 F. Supp. 3d at 945.

instead provides Settlement Class members the opportunity to receive a cash payout without any work or expense at all.

In sum, the proposed Settlement provides substantial relief to the Settlement Class Members, without the cost, risk, or delays of further litigation at the trial and appellate levels.

### D. Defendants' Financial Condition

There is no indication that First Arkansas will be unable to fulfill its obligations under the Settlement, particularly funding the remainder of the Settlement Fund that will be paid out to claimants.  It also appears that First Arkansas would have the resources to mount a vigorous defense of this action.  This factor therefore weighs in favor of approval.[73]

### E. Lack of Merited Opposition to the Settlement

1. Background Concerning the "Objection"

On February 1, 2017, purporting to represent 48 objectors (the "Objectors"), counsel for the Objectors ("Objectors' Counsel") filed an omnibus "Objection." (Dkt. No. 42.)   The Objection attaches a series of identical form statements that each purported Objector signed (the "Form Statements").[74]   None of the Form Statements articulate any basis for the objection at all.  Based on a federal docket search, many of the Objectors have served as clients for Objectors'

---

[73] *See Khoday*, 2016 U.S. Dist. LEXIS 55543, at *16-17; *see also Cortex v. Neb. Beef, Ltd.*, 2012 U.S. Dist. LEXIS 15486, at *8 (D. Neb. Feb. 9, 2012) ("With respect to defendant's financial condition, plaintiffs have shown that Nebraska Beef has the ability to fund the settlement in that Nebraska Beef has placed the funds in escrow, in accordance with the settlement agreement.").

[74] Each objector (1) respectfully objects to final approval; (2) received notice of the settlement, (3) received the unsolicited fax at issue; and (4) does not intend to appear at the final approval hearing or call any witnesses.  Each statement indicates that the Objector "will appear through counsel" at the final approval hearing, "object[s] to the class settlement," and "hereby adopt[s] the Objection to Final Approval of Class Settlement submitted by my attorneys in this matter."

Counsel in TCPA lawsuits, some numerous times.[75]  Nine of the 48 Form Statements are signed by the same person, Dr. Mustafa Arsiwala, who apparently owns or operates multiple clinics in Michigan.[76]

First Arkansas issued deposition notices to ten of the Objectors located in the Chicago, Illinois area.[77]  Objectors' Counsel moved to quash the subpoenas.[78]  Following an expedited hearing, the U.S. District Court for the Northern District of Illinois ordered those ten Objectors to answer two questions without objection.[79]  Those ten Objectors served responses on March 16, 2017.[80]  Although some of the responses are ambiguously worded, they appear to indicate that: (1) Objector's Counsel was retained by all ten Objectors before those Objectors received notice of the potential settlement in this litigation – in some cases years earlier;[81] (2) with respect to at least six of the ten Objectors, Objectors' Counsel contacted the Objector first about the proposed Settlement;[82] and (3) at least nine of the ten Objectors apparently did not review the Objection until after they executed the Form Statement purporting to "hereby adopt" the Objection.[83]

     2.   <u>The Objection is Without Merit</u>

---

[75] *Id.*

[76] Those nine affidavits correspond to Brighton Urgent Care, P.C., Dundee Urgent Care, P.C., Grosse Point Urgent Care, P.C., Michigan Urgent Care, P.C. Samaritan Urgent Care, P.C., Urgent Care of Novi, P.C., Washtenaw Urgent Care, P.C., and Western Wayne Urgent Care, P.C.

[77] Dkt. No. 53.

[78] Dkt. No. 53.

[79] Dkt. No. 55-1, Declaration of Lewis Wiener in Support of First Arkansas Bank & Trust's Notice of Order ("Wiener Declaration"), Exhibit A thereto.

[80] Dkt. No. 55, Notice of Order (attaching responses).

[81] *See, e.g.*, Dkt. No. 55-10 (Ex. I to Wiener Declaration), Affiliated Healthcare Response (retained Edelman, Combs firm in July 2013); Dkt. No. 55-5 (Ex. D to Wiener Declaration), James Orrington, II, DDS, P.C. Response (retained Edelman, Combs firm in October 2009).

[82] *See, e.g.*, Dkt. No. 55-4, Podiatry in Motion Response (Ex. C to Wiener Declaration) (stating that "Edelman, Combs, Latturner & Goodwin, LLC initiated communications with Podiatry in Motion after the settlement was preliminarily approved").

[83] With respect to Affiliated Healthcare (Ex. I to Wiener Declaration), it is unclear from the response whether that entity reviewed the Objection before or after it was filed.

As to the Objection, even taking the number of Form Statements at face value, they reflect only 0.013% of the Settlement Class Members and just 0.92% of the Claimants.  Only 14 Settlement Class Members opted out, reflecting just 0.004% the Settlement Class.  These figures are far lower than the rates of objection and exclusion in settlements finally approved by the Eighth Circuit or district courts within it.[84]  For example, in *Petrovic v. AMOCO Oil Co.*, the Eighth Circuit affirmed final approval of a settlement in which just under 4% of the settlement class objected to the settlement, finding that this figure was "significantly fewer than the number of objectors to other settlements that have been approved."[85]  The Court should also take note that (1) some (if not all) of the Objectors did not even review the filed Objection before executing Form Statements, which themselves fail to articulate any basis of objection; and (2) aside from the people and entities represented by Objectors' Counsel, not a single independent Settlement Class Member has objected to the Settlement.  To the extent that the Objection suggests that there is a groundswell of organic opposition to the Settlement, that is counterfactual.

Nevertheless, the Court's analysis of the Settlement is qualitative, not quantitative, and the Court is obligated to consider the objections on their merits.  As a matter of substance, all of the asserted objections are without merit.

First, in an argument that it is difficult to follow, the Objection contends that not including MasterCard in the Settlement somehow does a disservice to the Settlement Class and that MasterCard might have a complete defense based on the Release.  The proposed intervenors raised this concern months ago at the preliminary approval stage, and it has already been addressed: as the Settlement, the parties' stipulation, and the Court's Preliminary Approval Order

---

[84] *See Khoday*, 2016 U.S. Dist. LEXIS 55543, at *18-19 (citing *Marshall*, 787 F.3d at 513).
[85] 200 F.3d at 1152 (citing *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988)).

all confirm, *MasterCard is not a "Released Party" under the Release*.  (Dkt No. 40 ¶ 2.)  Thus, if Objectors' Counsel genuinely believes that MasterCard is an additional "sender" from whom Settlement Class Members can and recover, it is entitled to pursue that claim in the *Scoma* action, as it is apparently doing already.  The Objection also makes the bare allegation that the Release terms somehow provide MasterCard a complete defense.  However, the Objection offers no legal or factual support for this proposition, which is not surprising given that MasterCard is clearly not a party to the Settlement and that, by prior order of this Court, it does not release MasterCard as a matter of law.  Accordingly, there is no basis for the Court to credit this argument.

Second, Objectors' Counsel complains that the Settlement is supported only by "vague generalities" concerning the relative strengths and weaknesses of the claims at issue.  That argument has no application to the arguments asserted herein, which are supported by specific citations to relevant case law, including a wealth of decisions demonstrating the legitimate obstacles faced by proceeding further.

Third, the Objection contends that the Settlement is unreasonable because First Arkansas "has not demonstrated an inability to pay more than 0.8% of the value of the claim."[86]  The Objection provides no applicable legal support for this position, which seemingly would require a settling defendant to prove the total amount it could *potentially* pay to settle a case.  That is not the state of the law.  For example, in *Marshall v. National Football League*, 787 F.3d 502 (8th Cir. 2015) – the lone case cited in the Objection on this issue – the Eighth Circuit addressed the "financial condition" factor by determining whether the NFL could "adequately pay for its

---

[86] Dkt. 42 at 21-22.

settlement obligations or continue with a spirited defense in the litigation."[87]  There was no analysis as to whether the NFL had "much greater resources and assets" or could potentially pay more, as Objectors suggest should be done in this case.  Here, as in *Marshall*, First Arkansas indisputably can "pay for its settlement obligations or continue with a spirited defense." For that reason, the financial condition factor is, at worst, "neutral" in that respect.[88]

Moreover, the argument is premised on the ludicrous notion that the relevant benchmark for the Court's analysis is the ***maximum statutory recovery*** if a class is certified, assuming that there are ***no viable merits defenses***, that a class will be certified, that ***every class member will make a claim***, and that there are no conceivable risks or counter-balancing considerations to proceeding further.  The Objection provides no legal support for this proposition either.  As described above, that is plainly not the standard in the Eighth Circuit.[89]

Fourth, the Objection complains that Settlement Class Counsel failed to provide a substantiated lodestar and that counsel should be faulted for reaching a settlement without extensive motion practice and formal discovery.  Those concerns are already addressed (as/where they should be under both standard practice and the Court's Preliminary Approval Order) in the previously filed Motion for Fees, Costs, and Incentive Award (Dkt. No. 50), which provides a lodestar and details the steps that Settlement Class Counsel have undertaken for the benefit of the class. As expressed in his affidavit, Sidney McCollum, a former Arkansas judge and pre-eminent mediator with over 50 years of experience, reviewed the record and approves of the performance of Settlement Class Counsel in reaching a fair result through productive and

---

[87] *Marshall*, 787 F.3d at 512.

[88] *Id.*

[89] Similarly, in *In re Portfolio Recovery Associates*, Objectors' Counsel argued that it would be "unrealistic" to measure the settlement against a full statutory recovery by all class members. *See* Ex. 3 to Fourth Leniski Declaration, *Portfolio* Dkt. No. 355, at p. 20.

skillful litigation.[90] Similarly, as expressed in his affidavit, Rick Ramsay also confirms that Settlement Class Counsel argued vigorously on behalf of the Settlement Class as part of a hard-fought mediation.

Fifth, Objectors' Counsel asserts once again that the settlement is likely the result of a "reverse auction," suggesting that Settlement Class Counsel are "ineffectual," the "weakest attorney[s]," and have acted as "ineffectual lawyers" who have procured a "weak settlement." Disparaging the acumen or prowess of Settlement Class Counsel, however, will not carry objectors very far, especially when the claim is demonstrably false.[91]   Leaving aside the hyperbole, the gravamen of this objection seems to be that the settlement is unreasonably low. As described above, that it is simply not the case when this case is compared against TCPA class settlements inside and outside of the Eighth Circuit.  Indeed, two of the Objectors themselves (Podiatry in Motion and Dr. Orrington) obtained final approval of a class settlement on a lower rate per class member in the *CoverMyMeds* litigation, after representing to a federal court that that recovery at that rate was reasonable.[92]  The related accusation that Settlement Class Counsel performed no work in this case is also flatly contradicted by the record.   As has been exhaustively established already, Settlement Class Counsel has invested substantial time and effort to investigating, prosecuting, and resolving this case, including obtaining substantial document discovery from Dr. Shah and Dental Equities, analyzing voluminous records produced by them, drafting revised pleadings to incorporate additional factual findings and to add a potentially responsible party, participating in all-day mediation, and actively negotiating the

---

[90] Affidavit of Sidney McCollum, attached as **Exhibit 1** to Fourth Leniski Declaration.

[91] *See* Dkt. No. 52 (describing how Settlement Class Counsel have experienced tremendous success litigating complex matters across the country).

[92] *See* **Exhibit 9** to Fourth Leniski Declaration, *Podiatry in Motion, Inc., et al. v. CoverMyMeds, LLC, et al.*, No. 1:16-cv-02653 (N.D. Ill.) (Dkt. Nos. 65 and 67).

remaining settlement terms, among other activities.  Mr. McCollum has reviewed the record and believes that Settlement Class Counsel's efforts "have been both productive and efficient" and reflect "a high degree of quality and skill."[93]  Mr. Ramsay also confirms that Settlement Class Counsel acted as strong advocates for the Settlement Class in mediating this dispute.  These opinions demonstrably refute the objection that the record in this case demonstrates a lack of effort, preparation, skill, or zealous advocacy by Settlement Class Counsel.

## V.  <u>**Rule 23 Certification Factors Are Satisfied.**</u>

To grant final approval, the Court must find that the four prerequisites of Rule 23(a) (numerosity, commonality, adequacy, and typicality) are satisfied and that the Settlement Class fits within one of the categories of Rule 23(b). The Court previously held on a preliminary basis that these Rule 23 certification requirements were satisfied.  The Defendants agreed not to oppose final certification of the Settlement Class, which plainly meets the certification requirements.

### A.  **The Rule 23(a) Requirements Are Met**

*Numerosity*.  Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable.[94]  The numerosity requirement of Rule 23(a) is satisfied here because the Settlement Class consists of over 380,000 individuals or entities to whom the faxes at issue were successfully transmitted.  Joinder is therefore impracticable.

*Commonality*.  Commonality can be satisfied if "there is a single legal issue common to all members of the class . . . . Therefore, factual differences are not fatal if common questions of

---

[93] *See* **Exhibit 1** to Fourth Leniski Declaration, McCollum Affidavit ¶ 11.
[94] *In re Aquila ERISA Litig.*, 237 F.R.D. 202, 207 (W.D. Mo. July 18, 2006)..

law exist."[95]  The commonality requirement is satisfied because there are numerous questions of law and fact common to the Settlement Class that center on Defendants' common practice of sending unsolicited faxes as part of a marketing campaign related to Doctors' Club credit cards.

*Typicality*:  Typicality requires a demonstration that there are other members of the class who have the same or similar grievances as the class representative.[96]  This requirement is met "fairly easily," so long as other class members have claims similar to those of the named plaintiff.[97]  Here, typicality is satisfied because the Plaintiff and the Settlement Class Members all received a fax advertising the availability of "Doctors' Club" credit cards.  The claims of the Plaintiff arise out of the same alleged course of conduct, and seek the same statutory damages. Its claims are therefore typical of those of the Settlement Class.[98]

*Adequacy*.  Adequacy involves whether (1) the class representative has a common interest with the members of the class, and (2) whether the class representative will vigorously prosecute the interests of the class through qualified counsel."[99]  Here, the Representative Plaintiff's interests are coextensive with the interests of the settlement class in recovering statutory damages from the Defendants for the alleged TCPA violations and in obtaining injunctive relief to prevent Defendants from sending unsolicited faxes in the future.  Moreover, as reflected in prior submissions and as confirmed by Mr. McCollum and Mr. Ramsay in their affidavits, Settlement Class Counsel have a track record of success in prosecuting class actions

---

[95] *Ford v. Townsend of Ark., Inc.*, 2010 U.S. Dist. LEXIS 46093, at * 18 (E.D. Ark. Apr. 9, 2010).
[96] *Aquila*, 237 F.R.D. at 209.
[97] *Id.*; *see also Ford*, 2010 U.S. Dist. LEXIS 46093, at *19 (stating this requirement is "usually fairly easily met by showing that the claims of the proposed class members stem from a single event or are based on the same legal or remedial theory.")
[98] *Doran v. Mo. Dep't of Social Servs.*, 251 F.R.D. 401, 405 (W.D. Mo. 2008).
[99] *Jones v. NovaStar Fin., Inc.*, 257 F.R.D. 181 (W.D. Mo. Apr. 6, 2009) (citing *Paxton v. Union National Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982)).

31

38075772.5

and complex cases, and have zealously represented the Representative Plaintiff and the interests of the Settlement Class throughout this litigation.[100]   These qualifications are more than sufficient to satisfy the adequacy requirement under Rule 23(a)(4).

### B.   The Rule 23(b)(3) and the Rule 23(b)(2) Standards are Met

Rule 23(b)(3) "provides that a class action may be maintained if the court finds the questions of law or fact common to members of the class predominate over the questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the dispute.[101]   Here, the case involves a common set of faxes sent by or on behalf of Defendants advertising the same "Doctors' Club" credit cards.   The central questions of liability turn on generalized proof: (1) did Defendants authorize the faxes at issue to be sent?; (2) did the faxes lack the required opt-out language?; (3) did the faxes advertise goods or services of (or on behalf of) Defendants?; and (4) did Defendants or anyone operating on their behalf have prior express consent to send the faxes?   These questions are susceptible to class adjudication on an up or down basis. Also, resolution of the Settlement Class Members' claims through a class-wide settlement is the superior way to resolve this case in terms efficiency and fairness, a many courts have recognized with respect to TCPA class actions.[102]   For purposes of

---

[100] *See* Ex. 1 to Fourth Leniski Declaration, McCollum Affidavit ¶ 9; Ex. 2 to Fourth Leniski Declaration, Ramsay Affidavit; *see also* Dkt. No. 52, Third Leniski Declaration ¶¶ 31-32 and Ex. 1 thereto; Dkt. No. 51, Declaration of James A. Street ¶¶ 4-7.

[101] *Grovatt St. Jude Med. Ctr. (In re St Jude Med., Inc.)*, 425 F.3d 1116, 1119 (8th Cir. 2005). Also, when settling a class action, a plaintiff does not need to prove manageability under Rule 23(b)(3) as if the case were being fully litigated, because settlement may eliminate the issues that he court would have to resolve if the parties fought out the case.   *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660 (7th Cir. 2004) (citing *Amchem*, 521 U.S. 591 (1997)).

[102] *See, e.g.*, *Prater v. Medicredit, Inc.*, 2015 U.S. Dist. LEXIS 167215, at *6 (E.D. Mo. Dec .7, 2015); *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 571-72 (W.D. Wash. 2012); *Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 629-630 (C.D. Cal. 2015); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1308 (D. Nev. 2014).

final settlement approval only, the Defendants do not dispute certification under Rule 23(b)(3) is warranted.  For these reasons, the Court should certify the Settlement Class under Rule 23(b)(3).

Finally, to show that certification is warranted under Rule 23(b)(2), the Plaintiff must show that the Defendants have "acted or refused to act on grounds that generally apply to the class so that injunctive or declaratory relief is appropriate."[103]  That standard is easily met here, because the case concerns a blast faxing promotional campaign that the Second Amended Complaint alleges occurred without the prior express consent of the Representative Plaintiff or any other Settlement Class Members.[104]  Again, for purposes of final settlement approval only, the Defendants do not dispute that certification under Rule 23(b)(2) is warranted.  For these reasons, the Court should also certify the Settlement Class under Rule 23(b)(2) for purposes of awarding injunctive relief.

## VI. Distribution of Notice of the Settlement Satisfied Due Process Requirements and the Requirements of Rule 23

Under Rule 23(e)(1)(B), the court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement.  "There is no one 'right way' to provide notice as contemplated under Rule 23(e)."[105]  "Notice of a settlement proposal need only be as directed by the district court . . . and reasonable enough to satisfy due process."[106]  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

---

[103] *Ford*, 2010 U.S. Dist. LEXIS 46093, at *22.
[104] Again, as with provisional certification of a Rule 23(b)(3) class, the Court need not finally determine at this stage whether certification of a Rule 23(b)(2) class is warranted.
[105] *In re Wireless Tele. Fed. Recovery Fees Litig.*, No. 02-091, 2004 U.S. Dist. LEXIS 23342, at *26 (W.D. Mo. Apr. 20, 2004).
[106] *DeBoer v. Mellong Mortg. Co.*, 64 F.3d 1171, 1176 (8th Cir. 1995).

33

objections."[107]   Also, the substance of the notice must describe, in plain language, the nature of the action, the definition of the proposed settlement class, the class claims, and the defenses at issue.[108]   The notice must also explain that class members may enter an appearance through counsel if desired, may request to be excluded from the class, and that a class judgment shall have a binding effect on all class members.[109]

Here, the Court previously approved the Notice Plan and held that "[t]he notice plan, in form, method, and content, complies with the requirements of Rule 23 and due process and constitutes the best notice practicable under the circumstances."[110]   As detailed in the Brasfield Declaration, the Claims Administrator carried out the Court-approved Notice Plan and used all reasonable efforts to provide notice to the Settlement Class Members in conformance therewith. Moreover, here is a rare example in which the parties have provided notice to Settlement Class Members using the original contacts for the facsimiles that gave rise to these claims.

The Claims Administrator is highly experienced and there is no reason to doubt the integrity of the claims administration process.   The claims rate of 1.51% for the successful fax transmissions is comparable to the rates in other TCPA class action settlements that courts have finally approved under Rule 23.[111]   Accordingly, the Notice Plan ensured that Settlement Class Members' due process rights were amply protected and that the Rule 23(e)(1)(B) requirement has been satisfied.

---

[107] *Petrovic*, 200 F.3d at 1153 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306. 314 (1950)).

[108] Fed. R. Civ. P. 23(c)(2)(B).

[109] *Id.*

[110] Dkt. No. 40 at ¶ 11.

[111] *See, e.g., Lees*, 2015 U.S. Dist. LEXIS 74902 at (claims rate of less than 2%); *Spillman v. RPM Pizza, LLC*, 2013 U.S. Dist. LEXIS 72947, at *8 (M.D. La. May 23, 2013) (less than 1% claims rate); *Bayat v. Bank of the West*, 2015 U.S. Dist. LEXIS 50416, at *15-16 (1.9% claims rate); *Arthur v. SLM Corp.*, No. 2:10-cv-00198, Dkt. No. 249 at 3-4 (W.D. Wash. Aug. 1, 2012) (2.1% claim rate) (attached as **Exhibit 11** to the Fourth Leniski Declaration).

38075772.5

## CONCLUSIONS

For the foregoing reasons, the Representative Plaintiff respectfully requests that the Court grant final approval of the Settlement, finally certify a settlement class under Rule 23, determine that adequate notice was provided to the Settlement Class in conformity with the Court's Preliminary Approval Order, Rule 23(c)(2)(B), and due process; and enter the Final Approval Order and Judgment attached as **Exhibit A to** the Motion for Final Approval.

Dated: March 22, 2017                    Respectfully submitted,

*/s/ **Joe P. Leniski, Jr.***

**BRANSTETTER, STRANCH, & JENNINGS, PLLC**
Joe P. Leniski, Jr., TN Bar #22891
Gerard Stranch, TN Bar #23045
223 Rosa Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone:    615-254-8801
Facsimile:    615-255-5419
joeyl@bsjfirm.com
gerards@bsjfirm.com
aorlandi@bsjfirm.com

**STREETT LAW FIRM, P.A.**
James A. Streett, ABA #2007092
Alex G. Streett, ABA #65038
107 West Main
Russellville, AR 72801
Telephone:    479-968-2030
Facsimile:    479-968-6253
James@StreettLaw.com
Alex@StreettLaw.com

*Attorneys for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

      I, Joe P. Leniski, Jr., hereby certify that I am an attorney for the Plaintiffs, and on this day I caused this filing to be served on all counsel of record in this proceeding via CM/ECF.

DATED: March 22, 2017         ***/s/ Joe P. Leniski, Jr.***
                             JOE P. LENISKI, JR.

38075772.5